IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 08-0730 WHA |
| Plaintiff, | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT GUEVARA'S MOTIONS TO SUPPRESS REGARDING EYEWITNESS IDENTIFICATIONS, SEARCHES, AND ARREST** |
| v. | |
| ANGEL NOEL GUEVARA, *et al*. | |
| Defendants. | |

**INTRODUCTION**

Defendant Angel Noel Guevara moves to suppress eyewitness identifications of him and all fruit flowing from the eyewitness identifications, on the basis that the identifications were unreliable and based on unduly suggestive photographic line-ups (Dkt. No. 1995). Mr. Guevara also seeks to exclude evidence seized as a result of warrant-authorized searches of his residence at 41 Vienna Street in San Francisco, his vehicle, and his person, on the grounds that the searches were premised on unlawful eyewitness identifications, the search warrant was overbroad, and items outside the scope of the warrant were improperly seized (Dkt. No. 1996). Finally, Mr. Guevara seeks to exclude any evidence resulting from his warrantless arrest on December 30, 2007 (*ibid*.). For the reasons stated herein, the motions are **GRANTED IN PART AND DENIED IN PART**.

**STATEMENT**

As a preliminary matter, a moving defendant must ordinarily comply with Criminal Local Rule 47-2(b), which requires sworn declarations or affidavits for motions presenting issues of fact. Denial of a suppression motion because the moving defendant failed to submit a supporting

declaration has been affirmed by the court of appeals. *United States v. Wardlow*, 951 F.2d 1115, 1116 (9th Cir. 1991). Here, Mr. Guevara has proffered a declaration establishing his expectation of privacy in the locations searched (Dkt. No. 2299). For the purposes of Mr. Guevara's instant motions, this declaration is sufficient. All other factual issues are either undisputed or are facts that only police officers or unidentified witnesses have personal knowledge of. Thus, Mr. Guevara's proffer of police reports is an adequate basis for his motions, as it is reasonable to presume that the officers would testify in accordance with their own reports. Further, where Mr. Guevara's motion challenges a warrantless search or seizure, the burden is on the government to justify the search or seizure or to show an exception. That is, once Mr. Guevara demonstrates that a warrantless search or seizure occurred, the burden shifts to the government to demonstrate a justification or exception to the warrant requirement.

Mr. Guevara's motions are primarily based on his challenge to eyewitness identifications made in connection with two separate incidents that occurred on December 26, 2007. In the first incident, a male victim was stabbed near 24th Street and Shotwell Street in San Francisco. In the second incident, a male victim and a female victim were stabbed near Mission Street and Silver Avenue in San Francisco.

### 1. STABBING AT 24TH AND SHOTWELL ON DECEMBER 26, 2007.

According to SFPD Officer Lamar Toney's police report, at approximately 7:05 p.m. on December 26, 2007, a male victim ("Shotwell Victim") was attacked with a knife near 24th Street and Shotwell Street in San Francisco (Dkt. No. 1995-1 at 5). Shotwell Victim was stabbed in the face by a man he described as Hispanic and wearing a red shirt. Shotwell Victim sustained a deep four-inch cut on the side of his face. Shotwell Victim told Officer Toney that he would not be able to recognize the assailant if he saw him again.

Shotwell Victim gave a slightly different description of his assailant to SFPD Sergeant Dion McDonnell. According to Sergeant McDonnell's police report, Shotwell Victim described the attacker as "a latin male wearing all dark clothing" (Dkt. No. 1995-2 at 18). In contrast to his statement to Officer Toney, Shotwell Victim told Sergeant McDonnell that he believed he could identify the suspect if he saw him again (*id*. at 15). Almost two months after the stabbing,

2

Shotwell Victim identified Mr. Guevara in a photographic line-up (*id*. at 17). This photographic line-up was the first of two male photographic line-ups that Shotwell Victim was given (Dkt. No. 2133-5 at 5). Shotwell Victim did not identify anyone in the second line-up, which did not contain a photograph of Mr. Guevara (*id*. at 7). After identifying Mr. Guevara, Shotwell Victim noted that Mr. Guevara yelled "MS" after stabbing him (Dkt. No. 1995-2 at 18).

### 2. STABBING AT MISSION AND SILVER ON DECEMBER 26, 2007.

About thirty minutes after the stabbing at 24th and Shotwell, a woman and a man were stabbed at a bus stop near Mission Street and Silver Avenue in San Francisco (Dkt. No. 1995-1 at 15–16). The police spoke with four witnesses to the stabbings — the female victim ("Mission Female Victim"), the male victim ("Mission Male Victim"), and two witnesses ("Mission Witness No. 1" and "Mission Witness No. 2") (*id*. at 15–22). There were two assailants — a woman and a man. The male assailant shouted "MS" and stabbed Mission Male Victim (*id*. at 16–17, 20, 37). The female assailant yelled "MS" and stabbed Mission Female Victim (*id*. at 15–18, 39).[1]

Three of the four witnesses were given a six-pack photographic line-up. Two of these witnesses — Mission Male Victim and Mission Female Victim — were given the same photographic line-up and identified Mr. Guevara (Dkt. Nos. 2133-2, 2133-3). The third witness that was given a photographic line-up — Mission Witness No. 1 — did not make an identification, but stated that the male assailant "looked like" Mr. Guevara (Dkt. No. 1995-1 at 37). Mission Witness No. 1 was given a different photographic line-up from the one given to Mission Male Victim and Mission Female Victim (Dkt. No. 2133-1).

Each of the four witnesses provided descriptions of the assailants. As detailed below, however, the witnesses gave slightly varying descriptions of the male assailant.

#### A. Mission Witness No. 1.

Mission Witness No. 1 was the boyfriend of Mission Female Victim. Mission Witness No. 1 gave a number of descriptions of the male assailant to different SFPD police officers. All

---

[1] One police report indicated that Mission Witness No. 1 stated that the male assailant stabbed Mission Female Victim (Dkt. No. 1995-1 at 18). Mission Witness No. 1, however, stated at a different time that he did not see the stabbing of Mission Female Victim (*id*. at 17).

3

interviews of Mission Witness No. 1 regarding the male assailant's appearance occurred prior to his review of the photographic line-up.

Mission Witness No. 1 described the male assailant to Officer Castillo as a Latin male who was five feet six inches tall, 160 pounds, in his thirties, and wearing a black hoodie and jeans (Dkt. No. 1995-1 at 15). Mission Witness No. 1 gave a slightly differing description to Inspector Lau — he told Inspector Lau that the male assailant was in his thirties, five feet eight inches tall, 180 to 200 pounds, "stocky," had crew-cut hair slicked back slightly, had a medium complexion with a one to one-and-a-half inch scar or burn on his face/cheek area, may not have had facial hair, and was wearing a dark blue hooded sweatshirt and black pants (*id*. at 36). Mission Witness No. 1 also described the male assailant in two written statements. One statement described him as five feet six inches tall with brown skin, wearing a black hoodie and blue jeans, with a scar on his left cheek (Dkt. No. 1995-2 at 23). The other statement described the male assailant as a 40-year old Hispanic male with brown skin, wearing a hoodie, with a scar on his right cheek (*id*. at 24).

Mission Witness No. 1 was unable to identify the male assailant in the line-up give to him, line-up number 7481 (Dkt. Nos. 1995-1 at 37, 2133-1). Mission Witness No. 1, however, stated that one of the individuals in the array (Mr. Guevara) resembled the male assailant.

### B. Mission Female Victim.

On the same day as the stabbing, Officer Castillo spoke with Mission Female Victim after she was treated for her injury (Dkt. No. 1995-1 at 15). Mission Female Victim described the male assailant, who accompanied the female assailant, as a Latin male in his thirties, five feet six inches tall, 160 pounds, and wearing a black hoodie. Mission Female Victim stated she would recognize the assailants if she saw them again. Mission Female Victim also provided her description of the male assailant in a written statement (Dkt. No. 1995-2 at 25). The written statement described the male assailant as wearing a black hoodie, as five feet eight inches or nine inches tall, with black hair, brown eyes, and dark skin. It is unclear from the police reports what time Mission Female Victim's written statement was given, although it appears to have been given on the same day as the stabbings (Dkt. No. 1995-1 at 18).

The day after the stabbings, Mission Female Victim was given a photographic line-up, line-

up number 7482 (Dkt. Nos. 1995-1 at 38, 2133-2). Line-up number 7482 was different from the line-up given to Mission Male Witness No. 1. Mission Female Victim identified Mr. Guevara as the male assailant. After Mission Female Victim identified Mr. Guevara, Inspector Lau asked her if she remembered a scar on the face of the male assailant, to which she replied that "something" on the male assailant's face "stood out" (Dkt. No. 1995-1 at 39). Prior to her identification of Mr. Guevara, however, Mission Female Victim did not mention to any police officers that she remembered a facial marking on the male assailant, and Mr. Guevara does not allege that any such pre-identification statement was made.

### C. Mission Male Victim.

Mission Male Victim was stabbed in the neck and rib cage by the male assailant (*id.* at 16). On the day of the stabbing, Mission Male Victim stated that he would not be able to recognize the person who stabbed him (*id.* at 20). Mission Male Victim was able to recall, however, that his assailant was a five feet two inches tall Latin male wearing a black hooded sweatshirt.

A week after his stabbing, Mission Male Victim identified Mr. Guevara in a photographic line-up, line-up number 7482 (Dkt. Nos. 1995-1 at 42, 2133-3). This was the same photographic line-up that Mission Female Victim was given. Mission Male Victim was interviewed when he gave the identification and recounted a "teardrop" tattoo under Mr. Guevara's left eye (Dkt. No. 1995-1 at 42). Mission Male Victim mentioned no other facial marks.

### D. Mission Witness No. 2.

Mission Witness No. 2 was interviewed by Inspector Lau two days after the stabbings (*id.* at 40). Mission Witness No. 2 stated that the male assailant was an "older" guy with a scar on his face, who looked "chunky," and was wearing a black hooded sweatshirt. After being asked to come in to do a photographic line-up, however, Mission Witness No. 2 told Inspector Lau that he "misspoke" and would not be able to identify anyone (*id.* at 41). Accordingly, Mission Witness No. 2 was not presented with a photographic line-up and never made an identification.

### 3. SEARCHES AND ARREST ON DECEMBER 30, 2007.

On December 30, 2007, Superior Court Judge Harold Kahn authorized a search warrant for 41 Vienna Street in San Francisco, the "person" of Angel Noel Guevara, and any vehicle under the

dominion and control of Mr. Guevara (Dkt. No. 1996-1 at 12). "Exhibit A" to the search warrant was attached and incorporated by reference. Exhibit A authorized the seizure of: a DNA sample from Mr. Guevara; a knife or similar cutting instrument capable of cutting and stabbing injuries; bloodstained clothing; and "Gang-related items including but not limited to writings, pictures, videos, clothing, personal accessories such as jewelry, etc., cell phone contents, and information stored on electronic devices pertaining to the Sureño-based gang 'Mara Salvatrucha'" (*id*. at 18).

The search warrant affidavit was signed by Inspector Lau (*id*. at 17). The Lau affidavit detailed that Mr. Guevara was positively identified by Mission Female Victim. The Lau affidavit also noted that Mission Witness No. 1 had stated that Mr. Guevara resembled the male assailant (*id*. at 16). The Lau affidavit did not mention the subsequent identifications by Mission Male Victim and Shotwell Victim, as these two identifications had not yet been made at the time of the warrant application. The Lau affidavit further specified that the witnesses recounted that the assailants yelled "MS" and "Mara Salvatrucha" prior to the stabbings, and that the witnesses believed that the attack involved Mara Salvatrucha (*id*. at 15–16). The Lau affidavit also stated that Inspector Lau's past experience on the Gang Task Force led him to believe that Mr. Guevara was a member of MS-13 and that the stabbings were gang-related, such that the seizure of gang-related items belonging to Mr. Guevara would assist in the prosecution of the crime as a gang-related crime (*id*. at 17).

During the search of 41 Vienna, Mr. Guevara was found in a room adjacent to the kitchen (*id*. at 10). Bullets/rounds were found in drawers of a dresser in that room — .357 magnum rounds were found in a white sock, small caliber bullets were found in a blue beanie cap, and two .380 caliber bullets were loose in the drawer (Dkt. Nos. 1996-1 at 7, 1996-3 at 7–9). The following were also seized from the room: a knife, hooded sweatshirts, blue bandanas, a blue beanie, a diploma, a letter to Veronica Hernandez, notebooks/journals, photographs, a camera, hats, a chess and checker board, shirts, a taser, a cell phone, keys, pay stubs, and letters with "Angel Guevara" written on them (Dkt. No. 1996-1 at 4–8). Many of these items had "MS-13" or other gang-related markings on them. Mr. Guevara's vehicle was also searched and a folding knife, t-shirt, compact discs, pay stub, and blue bandana were all found and seized from the vehicle (*id*. at 4).

6

Mr. Guevara was arrested during the search (*id*. at 10–11). After his arrest, Mr. Guevara was interviewed on tape. Mr. Guevara was advised of his Miranda rights and he stated that he understood each of his rights. Mr. Guevara stated he was not at the scene at the time of the incident and was home at the time of the incident.

**ANALYSIS**

**1. EYEWITNESS IDENTIFICATIONS.**

Mr. Guevara challenges the eyewitness identifications associated with both incidents. Specifically, he asserts that the photographic line-ups were unnecessarily suggestive and that the eyewitness identifications were unreliable. This order finds that the photographic line-ups and the circumstances surrounding the eyewitness identifications were not unnecessarily suggestive, let alone so suggestive that there was a substantial likelihood of irreparable misidentification. Consequently, a pretrial determination regarding the reliability of the eyewitness identifications is unnecessary. *See United States v. Bagley,* 772 F.2d 482, 492 (9th Cir. 1985). Such an inquiry is only required where a defendant's proffer shows that the eyewitness identification procedures were impermissibly suggestive. *Ibid*. No such showing has been made. Thus, the reliability of the eyewitness identifications will be a matter for the jury to consider at trial and this order need only address the suggestiveness of the line-ups. *See Manson v. Brathwaite*, 432 U.S. 98, 116 (1977). Each of the challenged line-ups and identifications are now discussed in turn.

**A. Line-Ups Presented to Mission Victims.**

Photographic line-up number 7482 was presented to both Mission Female Victim and Mission Male Victim (Dkt. Nos. 2133-2, 2133-3). Both identified Mr. Guevara in the line-up. The line-up included photographs of six individuals. All individuals in the line-up appeared to be of Hispanic or Latin-American descent.

Under the totality of the circumstances, the line-up cannot be said to be impermissibly suggestive and there is no allegation that the police officers did anything to threaten the integrity of the photographic line-up. Mr. Guevara points to a number of differences between the individuals in the photographic line-up, but none of these differences are disturbing. *First*, Mr. Guevara argues that his photograph was the only one where the head takes up a significantly

7

smaller portion of the frame than the other photographs. The difference in head size, however, was minimal. The width of Mr. Guevara's face was actually the same size as all but one of the other individuals in the line-up. *Second*, Mr. Guevara argues that the background of his photograph was darker than three of the other photographs, but lighter than two of the other photographs. Again, this difference was minor and did not render the photographic line-up impermissibly suggestive. *Third*, although Mr. Guevara argues that he was the only individual with a receding hairline, looked significantly older than the other individuals in the line-up, and was only one of two individuals with a round face, a review of the photographs does not comport with this assertion. Mr. Guevara did not appear to be much older than the other individuals, at least two other individuals appeared to have receding hairlines, and arguably all of the individuals had round faces.

Most notably, Mr. Guevara points out that he was the only individual in the line-up with a widow's peak hairline and the only individual with a facial scar. Neither Mission Male Victim nor Mission Female Victim, however, described the male assailant as having a widow's peak hairline. Nor did they describe the male assailant as having a scar on his face *before* being presented with the line-up. Although Mission Female Victim mentioned she remembered "something" about the male assailant's face, she only stated as much *after* she had identified Mr. Guevara. While it would have been ideal to have had additional individuals in the line-up who had widow's peak hairlines and/or facial scars, the line-up did not give rise to a substantial likelihood of irreparable misidentification. As the court of appeals has noted, participants in line-ups are going to have differing facial characteristics and it would be unduly burdensome to require police officials to obtain photographs of virtually identical individuals for a line-up. *United States v. Barron*, 575 F.2d 752, 755 (9th Cir. 1978).

Finally, although counsel argued at the hearing that the eyewitnesses may have communicated with each other before their identifications, counsel offered absolutely no support for this claim. In any event, even if there was evidence of improper communication between witnesses, such evidence does not speak to the suggestiveness of the line-up itself or procedures

utilized by the police officers. Instead, any such allegations are proper material for cross-examination.

**B.     Line-Up Presented to Mission Witness No. 1.**

Photographic line-up number 7481 was presented to Mission Witness No. 1 (Dkt. No. 2133-1). The line-up included different individuals and a different photograph of Mr. Guevara than the line-up presented to Mission Female Victim and Mission Male Victim. The line-up included photographs of six individuals, all of whom appeared to be of Hispanic or Latin-American descent. Mission Witness No. 1 did not identify Mr. Guevara in the line-up but did specify that the male assailant resembled Mr. Guevara.

Under the totality of the circumstances, the line-up was not impermissibly suggestive. *First*, although Mr. Guevara argues that the photographic line-up was impermissibly suggestive because he was the only suspect looking down, a minor difference in face position does not render a line-up impermissibly suggestive. Notably, line-up number 7482 — also challenged by Mr. Guevara — included only one suspect looking down and although Mr. Guevara was not the suspect looking down, he was still identified by Mission Female Victim and Mission Male Victim (Dkt. Nos. 2133-2, 2133-3). *Second*, although Mr. Guevara objects to the fact that he was the only one with short hair and a moustache, a round face, receding hairline, and looked significantly older than the other individuals, a review of the photographic line-up does not bear out this concern. Other individuals in the line-up also had short hair and a mustache, had round faces, appeared to be of the same age as Mr. Guevara, and one other individual had a receding hairline. *Third*, Mr. Guevara argues that the line-up was unnecessarily suggestive because one individual had a ponytail and another had corn rows, despite Mission Witness No. 1's statement that the assailant had a slicked-back crew cut. Mr. Guevara himself, however, did not have a slicked-back crew cut in his photograph. Moreover, the SFPD's instructions for the photographic line-up clearly warn the potential identifying witness that hair styles may change and that the photographs may be new or old (Dkt. No. 2133-1 at 2).

One difficulty that the government did not directly address in its opposition is the impact of a permanent feature, such as a facial scar, being present on only one individual in a line-up, where

9

the feature was *previously* noted in the identifying witness' description of the suspect (*see* Dkt. No. 2133). Prior to being presented with a photographic line-up, Mission Witness No. 1 had noted several times that the male assailant had a scar on his face. Nonetheless, this quandary need not be resolved here because Mr. Guevara's scar was barely visible in the photographic line-up Mission Witness No. 1 was presented with. In fact, other individuals in the line-up had facial imperfections that were much more apparent than any markings on Mr. Guevara's face. In any case, Mission Witness No. 1 ultimately did not even identify Mr. Guevara — clearly indicating that the line-up could not have been so impermissibly suggestive as to result in an "irreparable misidentification."

### C. Line-Ups Presented to Shotwell Victim.

Two different male photographic line-ups were presented to Shotwell Victim (Dkt. No. 2133-5). The first line-up presented to Shotwell Victim resulted in an identification of Mr. Guevara (*id*. at 5). Mr. Guevara was not included in the second line-up and he does not challenge the second line-up (*id*. at 7). Thus, only the first line-up is discussed herein.

The first line-up given to Shotwell Victim was not the same as the line-up given to Mission Male Victim and Mission Female Victim. Although the photograph of Mr. Guevara was the same, the other individuals in the line-up were different. Like the previously-discussed line-ups, the line-up included photographs of six individuals, all of whom appeared to be of Hispanic or Latin-American descent. Also like the previously-discussed line-ups, the line-up was not impermissibly suggestive under the totality of the circumstances.

Mr. Guevara argues that he was the only individual in the line-up whose head took up a significantly smaller portion of the frame, that the background of his photograph was darker than the other backgrounds, that his photograph was clearer than the others, that he was the only one with a receding hairline, that he looked significantly older than the other individuals, and that he was the only individual with a visible scar on his face. Again, a review of the photographic line-up does not bear out these concerns. In many instances, the differences between photographs were not readily apparent. Even where there were differences, the differences were not unnecessarily or impermissibly suggestive. *First*, although one individual in the line-up appeared relatively young, the remaining individuals appeared close in age to Mr. Guevara. *Second*, Mr. Guevara's

photograph did not appear to be any more clear than the other photographs and the darkness of the background did not render the photograph suggestive. *Third*, Mr. Guevara's hair did not appear markedly different than the others — in fact, four of the other individuals had the same hairstyle. *Fourth*, the difference in Mr. Guevara's head size is minimal. Finally, although Mr. Guevara was the only individual in the line-up with a facial scar, Shotwell Victim had never mentioned a facial marking or scar in his descriptions of the assailant. Accordingly, the photographic line-up was not impermissibly suggestive.

### D. Request to Present Memory and Eyewitness ID Expert.

Mr. Guevara requests to present live testimony "by a scholar specializing in the field of eyewitness identification and memory" but only offered *examples* of who that expert *may* be and the general subject matter of the proposed testimony (Dkt. No. 1995 at 14). During the September 13 hearing, counsel clarified that the expert testimony would be presented at a pretrial evidentiary hearing, rather than at trial. As no pretrial evidentiary hearing on the reliability of the eyewitness identifications is required, such expert testimony is beside the point.

### 2. WARRANT-AUTHORIZED SEARCHES ON DECEMBER 30, 2007.

Mr. Guevara argues that the warrant-authorized searches of 41 Vienna, his person, and his vehicle were unlawful because the search warrant was lacking in probable cause. Specifically, Mr. Guevara contends that the search warrant was based entirely on the eyewitness identifications and all evidence seized as a result of the eyewitness identifications must be suppressed as "fruit of the poisonous tree." This argument is rejected. As stated above, the eyewitness identifications were not impermissibly suggestive and were thus a proper basis for probable cause. Additionally, although Mr. Guevara originally argued that the warrant was invalid because there was no probable cause to place his photographs in the photographic line-ups, Mr. Guevara subsequently conceded that there is no probable cause requirement to place an individual's photograph in a line-up (Dkt. No. 2172 at 3).

Mr. Guevara also argues that the warrant was facially overbroad and insufficiently particular. This argument is also rejected. In determining whether a warrant is overbroad and insufficiently particular, one or more of the following questions may be considered: (1) whether

11

probable cause exists to seize all items of a particular type described in the warrant; (2) whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not; and (3) whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued. *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986). Here, the warrant was not overbroad as there was probable cause to seize all items described in the warrant — a DNA sample, a knife or similar cutting instrument (the suspect weapon), bloodstained clothing that may have been worn during the stabbings, and items related to Mara Salvatrucha. The Lau affidavit specified that Mission Female Victim identified Mr. Guevara as the male assailant and Mission Witness No. 1 stated Mr. Guevara resembled the male assailant. From this, Judge Kahn reasonably concluded that there was a fair probability that evidence of the stabbings would be found at Mr. Guevara's residence, in his vehicle, or on his person. Additionally, unlike *Millender v. County of Los Angeles*, __ F.3d __, 2010 WL 3307491 (9th Cir. Aug. 24, 2010), the affidavit established probable cause that Mr. Guevara's suspected gang-affiliation was directly related to the stabbings. The Lau affidavit explained that the male assailant yelled "MS" and "Mara Salvatrucha" during the stabbings, indicating the stabbings were likely gang-motivated.

As for particularity, Exhibit A to the warrant offered sufficient guidance for the executing officers to determine which items were subject to seizure and which items were not. *See Spilotro*, 800 F.2d at 963. The warrant was not a "general" warrant — the officers were to seize specifically enumerated items that were direct evidence of the stabbings, or items that specifically pertained to Mara Salvatrucha. Warrants may authorize a search for classes of generic items where the government is not "able to describe the items more particularly in light of the information available to it at the time the warrant was issued." *Ibid*. Here, the nature of the evidence sought was not amenable to more particular description.

In any event, the warrant was not so facially overbroad or insufficiently particular that the *Leon* good-faith exception does not apply. The officers' reliance on the Judge Kahn's probable cause determination and on the technical sufficiency of the warrant was objectively reasonable.

12

*See United States v. Leon*, 468 U.S. 897, 923 (1984). Thus, the exclusionary rule does not apply to the items seized pursuant to the warrant.

### 3. SEIZURE OF BULLETS/ROUNDS DURING SEARCH OF 41 VIENNA.

During the warrant-authorized search of 41 Vienna, the officers seized ammunition found in a dresser in Mr. Guevara's bedroom. Specifically, the officers seized .357 magnum rounds that were stored inside a white sock, small caliber bullets stored in a blue beanie, and two .380 caliber bullets that were loose in a dresser drawer. The warrant, however, did not authorize seizure of ammunition or firearms. Accordingly, Mr. Guevara argues that the officers' seizure of the ammunition was outside of the scope of the warrant.

At the September 13 hearing, the government argued for the first time that the bullets found in the blue beanie — the small caliber bullets — were gang-related material because they were found inside gang-related material. Although the police records do not specify that this is why the small caliber bullets were seized, the inquiry is not what the seizing officers believed, but what would have been objectively reasonable given what the officers perceived at the time. *United States v. Prim*, 698 F.2d 972, 975 (9th Cir. 1983). It would have been objectively reasonable for an officer to view bullets stored within a blue beanie — arguably an item related to Mara Salvatrucha — to be part and parcel of that gang-related item.[2] The seizure of the small caliber bullets was accordingly a warrant-authorized seizure of gang-related materials.

The government, however, has not argued that the seizure of the .357 magnum rounds and the .380 caliber bullets was pursuant to the gang-related material provision of the warrant. Unlike the small caliber bullets, the .357 magnum rounds and the .380 caliber bullets were not stored inside any items that could have been construed by the searching officers to be gang-related — the .357 magnum rounds were stored in a white sock and the two .380 caliber bullets were loose in a dresser drawer. The seizure of the .357 magnum rounds and .380 caliber bullets was thus outside the authority of the warrant. Consequently, the seizure was unlawful unless the government demonstrates that an exception to the warrant requirement applies.

---

[2] The color blue is allegedly the "gang color" of Mara Salvatrucha.

13

To justify the seizure of the .357 magnum rounds and the .380 caliber bullets, the government entirely relies on its argument that the ammunition was properly seized under the plain-view doctrine. In order to have properly seized the ammunition under the plain-view doctrine, the officers must have been lawfully searching the dresser drawers and the incriminatory nature of the ammunition must have been *immediately* apparent. *See Horton v. California*, 496 U.S. 128, 136–137 (1990). Although the officers' examination of the contents of the dresser drawers was permissible because the warrant authorized a search for items that may have been located in the drawers, the ammunition was not properly seized because the incriminatory nature of the ammunition, if any, was not immediately apparent. Ammunition is not automatically contraband that may be seized without a warrant. *United States v. Blom*, 242 F.3d 799, 808 (8th Cir. 2001); *United States v. Lemons*, 153 F. Supp. 2d 948, 959–960 (E.D. Wis. 2001). The government's only proffered authority to support its claim that ammunition alone is contraband is *United States v. Stafford*, 416 F.3d 1068 (9th Cir. 2005). The government, however, overlooks the critical fact that the officers in *Stafford* reasonably believed they were seizing *armor-piercing* bullets — bullets that are *per se* illegal to possess in California. *Id.* at 1076–78. Similarly, the government cites *United States v. Wong*, 334 F.3d 831, 838 (9th Cir. 2003), for the proposition that a plain-view seizure of pornography was permissible even though the warrant only permitted a search of murder evidence (Dkt. No. 2142 at 6–7). Again, the government overlooks the critical detail that the seized pornography was *child* pornography — which is *per se* illegal contraband.

There is no indication that the officers actually perceived the ammunition to be *per se* illegal ammunition. The search warrant return and the police reports clearly specified that the officers perceived the bullets/rounds to be .357 magnum rounds and .380 caliber bullets — neither of which are illegal to possess. There is also no indication that the ammunition was perceived to be linked to criminal activity. The warrant and the warrant affidavit made no reference to firearms, ammunition, or unlawful acts involving either. Similarly, the government has not alleged that, at the time of the search, Mr. Guevara was suspected of committing any other crimes besides the stabbings. Nor does the government claim that Mr. Guevara was a felon or on probation or parole such that possession of ammunition would have been *per se* illegal.

Although the government argues that the ammunition was "legitimate contraband for a documented gang member," the government has failed to provide any authority that supports its contention that an alleged gang member is prohibited from possessing otherwise legal ammunition (*id*. at 7). Possession of the type of ammunition seized from Mr. Guevara was not illegal in California and Mr. Guevara's suspected gang membership did not change that. Mr. Guevara's storage of unused ammunition in his dresser drawers did not violate any of the penal code provisions cited by the government and there was no probable cause for the officers to believe that the ammunition was evidence that a crime had been committed. Thus, the government has failed to show that the seizure of the .357 magnum rounds and the .380 caliber bullets was a permissible warrantless seizure under the plain-view doctrine.

The government's sole argument as to why the exclusionary rule should not apply to any of the searches at issue is that the officers believed they were "searching pursuant to a validly obtained warrant" (Dkt. No. 2142 at 7). This argument, however, does not support application of the good-faith exception to the unlawful seizure of the .357 magnum rounds and the .380 caliber bullets. There is no indication that the officers actually believed the seizures were authorized by the warrant, nor that the officers could have reasonably believed the seizures were authorized. The government has asserted no other basis for the application of the good-faith exception to the .357 magnum rounds and the .380 caliber bullets. Thus, the government has failed to show that the exclusionary rule should not apply to the .357 magnum rounds and the .380 caliber bullets.

### 4. WARRANTLESS ARREST ON DECEMBER 30, 2007.

Mr. Guevara seeks to exclude any evidence seized as a result of his warrantless arrest on December 30, 2007. Mr. Guevara does not challenge the officers' entry into his residence, as the officers had entered pursuant to a search warrant, but argues that there was no probable cause to arrest him (Dkt. No. 1996 at 12). Probable cause for a warrantless arrest exists if the totality of circumstances would justify a prudent person's belief that the suspect had committed a crime. *Beck v. Ohio*, 379 U.S. 89, 91 (1964). For the same reasons that there was probable cause for the search warrant to issue, there was probable cause to arrest Mr. Guevara. Mr. Guevara had been identified by an eyewitness as the perpetrator of at least one stabbing. A prudent person would be

reasonable in believing that Mr. Guevara had committed a crime. Accordingly, the arrest of Mr. Guevara was lawful.

## CONCLUSION

For the reasons stated herein, Mr. Guevara's motions to suppress are **GRANTED IN PART AND DENIED IN PART**. Mr. Guevara's motions are **DENIED**, except as to the .380 caliber bullets and .357 magnum rounds. The seizure of the .380 caliber bullets and .357 magnum rounds was unlawful. Mr. Guevara's motion to suppress the .380 caliber bullets and .357 magnum rounds is **GRANTED**.

**IT IS SO ORDERED.**

Dated: September 28, 2010.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE